UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------X
```

WILLIAM WEDGE,

                          Plaintiff,

              v.

THE SHAWMUT DESIGN AND
CONSTRUCTION GROUP LONG TERM
DISABILITY INSURANCE PLAN and
RELIANCE STANDARD LIFE INSURANCE
COMPANY,

                     Defendants.

```
------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   June 2, 2014

12 Civ. 5645 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

On July 24, 2012, Plaintiff William Wedge commenced this litigation under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1191c, 1202-1242, 1301-1461, against Defendants Shawmut Design and Construction Group Long Term Disability Insurance Plan (the "Shawmut Plan" or "Plan") and Reliance Standard Life Insurance Company ("RSLI") to contest a denial of benefits by RSLI. Plaintiff, who has a disability that inhibits visual capacity in his right eye, was denied extended Long Term Disability Benefits from RSLI upon its determination that Plaintiff did not establish that he was "Totally Disabled," as defined under the Plan. Because RSLI's decision to deny Plaintiff the benefits sought was not arbitrary and capricious, Plaintiff's motion for summary judgment is denied, and Defendants' motion for summary judgment is granted.

**BACKGROUND**[1]

**A.    Plaintiff's Employment with Shawmut Design and Construction and His Long Term Disability Insurance Plan**

Plaintiff is a former employee of Shawmut Design and Construction Group ("Shawmut"), a construction management firm.  (56.1 Statement ¶ 2; AR 336-37).  During the relevant time period, Plaintiff was a Senior Project Manager at Shawmut, whose responsibilities included overseeing construction operations for large-scale projects that required an advanced level of construction expertise; these projects included the construction and/or renovation of luxury and premier specialty retail stores, health clubs, spas, and fitness centers.  (AR 328-29).  Plaintiff's job required him, among other things, to travel via car and airplane; drive; walk; ascend and descend stairs, ladders, and scaffolding; conduct extended construction-site visual inspections; read and work with construction drawings, plans, and hard-copy and computer-based documents; and partake in financial and strategy meetings.  (*Id.* at 331).

Shawmut established and maintained the Shawmut Plan, a benefit plan for its employees.  (*See* AR 1-31).  The Shawmut Plan, in turn, purchased Group Long Term Disability Policy No. 114007 (the "Policy") from Defendant

---

[1]    The facts contained in this Opinion are taken from the administrative record (referred to herein as "AR") and the Parties' Joint Local Rule 56.1 Statement of Facts ("56.1 Statement").

For convenience, the parties' memoranda of law will be referred to as follows: Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment as "Pl. Br."; Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment as "Def. Opp."; Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment as "Pl. Reply"; Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment as "Def. Br."; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment as "Pl. Opp."; and Defendants' Reply Brief in Support of Their Motion for Summary Judgment as "Def. Reply."

RSLI to provide long term disability ("LTD") benefits to Shawmut Plan beneficiaries.  (*See* 56.1 Statement ¶ 4).  Under this arrangement, Shawmut was the Plan's Administrator, and RSLI was the claim review fiduciary with respect to the Policy and the Plan.  (*Id.* at ¶¶ 5-6).  In this role, RSLI had "the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits."  (*Id.* at ¶ 6).

As a Shawmut employee, Plaintiff was a participant in, and received coverage under, the Shawmut Plan.  (56.1 Statement ¶ 3).  Based on Plaintiff's rate of earning, he was classified as a Class 2 employee under the Policy.  (*Id.* at ¶ 7).  For such employees, the Policy defines disability, in relevant part, as follows:

> "Totally Disabled" and "Total Disability" mean that, as a result of an Injury or Sickness: (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation ... (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation.  Any occupation is one that the insured's education, training or experience will reasonably allow ...

(AR 10).  The Policy also includes a provision that requires the offset of benefits received from what it termed Other Income Benefits, including any award of individual or family Social Security Disability benefits.  (*See id.* at 18).

**B.    Plaintiff's Disability and Initial Approval for Long Term Disability Benefits**

On February 23, 2009, while Plaintiff was employed by Shawmut, he was examined by Dr. Guarang Trivedi for a gray spot in the center of Plaintiff's field of vision in his right eye that had manifested two weeks earlier.  (AR 300-01).

In his medical report, Dr. Trivedi noted his impression that Plaintiff may have central serous chorioretinopathy ("CSCR") (*id.* at 300-01), which is also referred to as central serous retinopathy (56.1 Statement ¶ 11).[2]  Dr. Trivedi referred Plaintiff to Dr. Howard Charles for a retinal examination.  (AR 301).  Plaintiff was examined by Dr. Charles on February 25, 2009, during which Dr. Charles diagnosed Plaintiff with Type 1 CSCR.  (*Id.* at 311).  Dr. Charles explained, in a letter to Dr. Trivedi summarizing his examination of Plaintiff, that CSCR "tend[s] to resolve over weeks to months."  (*Id.*).[3]

Based on the prognosis received from Dr. Charles, on March 26, 2009, Plaintiff informed Shawmut that he was unable to perform the regular functions of his employment due to his CSCR.  (AR 328).  Plaintiff ceased working for Shawmut as of that day, and submitted a claim for benefits under Shawmut's short term disability plan.  (*See id.*).  A few months later, in July 2009, Plaintiff's condition had not improved, and he applied for LTD benefits under the Policy.  (*Id.* at 340-46).

RSLI granted Plaintiff's application for LTD benefits by letter dated April 8, 2010.  (AR 257-58).  In so doing, RSLI determined that Plaintiff became totally disabled from his Regular Occupation, as defined by the Policy, on March 27, 2009, and that benefits to him under the Plan were payable as of June 25, 2009, after the Elimination Period was satisfied.  (*Id.*).  In that same

---

[2]     "[CSCR] is a disease in which a serous detachment of the neurosensory retina occurs over an area of leakage from the choriocapillaris through the retinal pigment epithelium."  (AR 548).

[3]     In August of 2011, Dr. Charles revised his opinion to state that Plaintiff "falls in the minority of patients who do[] not experience resolution."  (AR 89).

letter, RSLI suggested that Plaintiff apply for Social Security Disability ("SSD") benefits.  More importantly for the instant litigation, RSLI informed Plaintiff that in order to qualify for LTD benefits beyond 24 months, Plaintiff must demonstrate that he is "totally disabled from performing the material duties of Any Occupation" as defined under the Policy.  (*Id.*).

## C.   Plaintiff's Social Security Administration Benefits

Plaintiff heeded RSLI's suggestion and applied for SSD benefits.  In connection with that application, Plaintiff was initially represented by counsel suggested by RSLI.  (*See* AR 214-15).  In December 2010, however, Plaintiff informed Shawmut that the appointed counsel intended to withdraw from representing him in the SSD benefits proceeding "based on an assessment that [Plaintiff's] claim ha[d] no merit."  (*Id.*).

In connection with his SSD application, Plaintiff was examined by Dr. Martin Bernstein, the SSA's independent ophthalmologist.  (AR 1536-41).  Dr. Bernstein's examination revealed that Plaintiff had peripheral count finger vision and no near vision acuity in his right eye.  (*Id.* at 1538).[4]  The examination further recounted that Plaintiff had informed Dr. Bernstein that any reading caused him "severe temporal headaches and eye aches and a tremendous feeling of tension, stress and some nausea."  (*Id.* at 1537). Notably, Dr. Bernstein discerned an inconsistency between Plaintiff's subjective

---

[4]     *See* Wendy Strouse Watt, O.D., "How Visual Acuity is Measured," http://lowvision.preventblindness.org/eye-conditions/how-visual-acuity-is-measured (last visited May 28, 2014) ("It is common to record vision worse than 20/400 as Count Fingers (CF at a certain number of feet), Hand Motion (HM at a certain number of feet), Light Perception (LP), or No Light Perception (NLP)."), *cited in Madera* v. *Ezekwe*, No. 10 Civ. 4459 (RJD)(LB), 2013 WL 6231799, at *4 n.7 (E.D.N.Y. Dec. 2, 2013).

complaints and the objective tests, and related in his report that he (Dr. Bernstein) could not explain, and the objective tests did not indicate, why Plaintiff's "central scotoma [was] so obviously much larger than the actual diameter of the pathology in the macula." (*Id.* at 1540).[5]

The SSA initially denied Plaintiff's request for benefits. Subsequently, in January 2012, U.S. Administrative Law Judge Roberto Lebron awarded Plaintiff SSD benefits. (AR 1494-99). In reaching this determination, Judge Lebron noted that he gave "great weight" to the opinions of Dr. Charles and of Dr. David Robbins, Plaintiff's psychiatrist. (*Id.* at 1498).

## D.    RSLI's Discontinuance of Plaintiff's Long Term Disability Benefits

After providing Plaintiff with LTD benefits for 24 months under the Policy on account of his demonstrated inability to perform the material duties of his Regular Occupation, RSLI informed Plaintiff by letter dated June 3, 2011, that he no longer qualified for LTD benefits because he had not demonstrated an inability to perform the material duties of any occupation, and thus had not satisfied the definition of "Totally Disabled" under the Policy. (AR 277-79). RSLI explained that although Plaintiff was unable to work in his prior occupation, he "appear[ed] capable of sedentary work activity." (*Id.* at 278).

To reach this determination, RSLI reviewed all of the information in Plaintiff's file, including medical records provided by Dr. Alphonso Aversa, Plaintiff's general physician; Dr. Seth Shifrin, who saw Plaintiff for an injury to his right thumb; Dr. Robbins; and Dr. Charles. (*Id.*). As relevant to Plaintiff's

---

[5]    Central scotoma is an area of decreased or lost vision that interferes with central vision, and the macula is a region within the retina of the eye. (AR 524, 549).

eye condition, Dr. Aversa, who saw Plaintiff for a comprehensive physical on May 18, 2010, indicated that Plaintiff's "visual loss has been unchanged," and that he was "followed regularly by ophthalmology." (*Id.* at 732). Dr. Charles indicated in a January 6, 2010 letter submitted in support of Plaintiff's initial claim for LTD benefits that Plaintiff complained of headaches "when having to do extended reading of the sorts he was required to do," a complaint that the doctor found consistent with the reported symptoms of CSCR. (*Id.* at 500). Subsequently, in the record of an examination of Plaintiff conducted on May 26, 2010, however, Dr. Charles stated that Plaintiff's "level of vision is not consistent with the macular findings," thereby echoing Dr. Bernstein's observation of the disparity between Plaintiff's illness and his reported symptoms. He suggested that Plaintiff would "benefit from an updated refraction [test]," and related that he had asked Plaintiff to schedule such a test. (*Id.* at 692).

RSLI also performed a Residual Employment Analysis ("REA"), which is designed to determine which occupation, if any, an insured has the ability to perform. (AR 741). After considering Plaintiff's medical information, along with his education and training, the REA concluded that in light of Plaintiff's physical restrictions and limitations, he was capable of performing one of the following occupations: Account Executive, Estimator, Media Planner, Public Relations Representative, or Advertising Sales Representative. (*Id.* at 742-43). Based on Plaintiff's entire file, including the medical records and the REA, RSLI concluded that Plaintiff would qualify for a subset of the occupations identified

by the REA, namely, Account Executive, Media Planner, and Estimator.  (*Id.* at 278).

### E.    Plaintiff's Appeal of RSLI's Termination of LTD Benefits

#### 1.    Plaintiff's Submissions In Connection With the Appeal

On December 20, 2011, through counsel, Plaintiff appealed RSLI's decision to terminate his LTD benefits.  (AR 776-86).  Plaintiff submitted the following materials in support of his appeal: two letters from Dr. Charles; treatment notes and the Social Security report submitted by Dr. Robbins; records of Dr. Bella Malits, who handled Plaintiff's pain management; treatment records from his primary care providers, orthopedists, and other specialists; a report from a vocational consultant, Andrew Pasternak; and a personal statement from Plaintiff himself.  (56.1 Statement ¶ 20).

These materials reflect that Plaintiff was examined by various physicians for an array of ailments, some of which were unrelated to Plaintiff's CSCR. Inasmuch as the parties have focused the instant motions on the medical evidence concerning Plaintiff's eye issues, the Court focuses on that evidence in this Opinion.  In this regard, Dr. Charles reported that in comparing Plaintiff's examination results from May 22, 2010, and August 31, 2011, there appeared to be a "slight progression" in Plaintiff's condition.  (AR 789).  Dr. Charles concluded that Plaintiff would have the following visual capacities in an eight-hour workday:

> His ability to read (near vision) would be for approximately 1 to 1-1/2 hours.  His ability to see at distance for any sustained period of time would probably also be for approximately 1 hour.  He might be able to have functioning far vision for 2-3 hours, provided he

> takes occasional breaks.  He will never have depth perception
> during the course of an 8-hour workday because he does not have
> useful central vision in one eye.... His peripheral visual field,
> however, would remain constant throughout an entire 8-hour
> workday, because the areas of damage involve the central and not
> the peripheral retina.

(*Id.* at 791).

Andrew Pasternak conducted a comprehensive vocational assessment, functional capability evaluation, and employability study, in which he concluded that Plaintiff was unable to perform the material duties of both his past occupation and any occupation for which his education, training, or experience would reasonably allow at a competitive sustained level.  (AR 809).

Pasternak explained:

> While on paper [Plaintiff] would appear to have many transferable
> skills, the ability to utilize any of them has been especially severely
> compromised by the functional negative effects of his somewhat
> rare eye condition.  Therefore, it is my concluding opinion that any
> possible transferability of his prior skills to a Sedentary job would
> be excluded by this.
>
> My conclusions are based on a combination of factors including
> the ongoing effects of his conditions with chronic pain in the lower
> back and neck, visual loss and pain in the right eye, and inability
> to maintain persistence to work task[s], and a competitive work
> pace, as well as an inability to concentrate[,] and to adapt
> appropriately to changes in the work setting.

(*Id.* at 809-10).

In his personal statement, Plaintiff related symptoms that he experienced as a result of his CSCR, and how he believed those symptoms restricted his ability to perform tasks that would be required for the positions identified by RSLI in its denial letter.  (AR 971-78).  In particular, Plaintiff stated that he was able to read and write on a computer for approximately one hour before he

developed a severe headache that was often accompanied by substantial muscular-skeletal pain in his neck and back, blurred vision in his left eye, and dizziness.  (*Id.* at 975).  With respect to his neck and back pain, Plaintiff identified that he had "underlying orthopedic problems with [his] back and neck, principally a herniated disc," and that the CSCR caused Plaintiff "to strain and twist around to see images or text on the computer, exacerbating [his] back and neck pain."  (*Id.* at 972).  Based on his subjective limitations, Plaintiff concluded his "visual limitations and their physiological consequences" would prevent him from working in any of the occupations identified by RSLI even though Plaintiff believed that his "cognitive capacity [was] still up to the task."  (*Id.* at 977).

### 2.    The Independent Medical Examination

By letter dated January 12, 2012, RSLI requested that Plaintiff attend an independent medical examination with Dr. Robert Josephberg on February 2, 2012.  (AR 284).  RSLI explained that upon reviewing the supplemental evidence that Plaintiff had provided in support of his appeal and consulting with RSLI's medical staff, it had determined that another medical opinion was appropriate.  (*Id.*).  Preparatory to the examination, Dr. Josephberg obtained Plaintiff's individual medical history and records documenting his CSCR.  At the examination, Plaintiff provided Dr. Josephberg with a memorandum dated February 7, 2012, regarding Plaintiff's condition and treatment history, which Dr. Josephberg reviewed.  (Plaintiff's Declaration dated Dec. 13, 2013, Ex. A).

After examining Plaintiff, Dr. Josephberg produced an initial report on or about February 21, 2012 (the "February 21 Report"). (AR 1581-91). The physical examination section of the February 21 Report related:

> On conclusion of my examination, [Plaintiff] had bare hand motion of vision in his right eye which was checked multiple times. He had a dense central scatoma in the right eye described by [Plaintiff] which appeared to approximately 70-80% of his vision by confrontation fields. There was no pupillary defect in either eye. [Plaintiff] described no color vision in the right eye even with large objects. Pupils were equal in both eyes and round and reactive. His left eye examination was totally normal. His right eye, however on objective exam, appeared to be in the 20/100 to 20/200 range at the worst. He possibly should see even 20/50. *In my medical exam, it was somewhat confusing in that my objective findings certainly did not match up to [Plaintiff's] subjective loss of vision. All testing done by me appears to show this is a gentleman who has much better vision than he is presenting to me.* All tests, including pupillary tests, neurological testing with OKN's [optokinetic nystagmus, i.e., an eye movement elicited by the tracking of a moving field], indicate that his vision should be in the 20/100 to 20/200 range at worst in the right eye. This would indicate minimal disability based upon his subjective complaints.

(*Id.* at 1583-84 (emphasis added)).

The medical record review section of the February 21 Report disclosed that Dr. Josephberg had reviewed Plaintiff's extensive medical file, including records from Dr. Charles and Mr. Pasternak. (AR 1584-86). Dr. Josephberg took particular note of Dr. Charles's observation in his May 26, 2010 record that Plaintiff's "level of vision is not consistent with his macular findings and [Dr. Charles] suspects [that Plaintiff] would benefit from an updated refraction," as well as Dr. Bernstein's observation that Plaintiff's large central scotoma in his right eye could not be explained based on Plaintiff's pathology. (*Id.* at 1586). From this information, Dr. Josephberg reasoned:

11

> It appears that multiple physicians have come to the conclusion that William Wedge's subjective complaints about his difficulty seeing out of his right eye [are] not what is seen on objective findings. Nobody can explain it based upon the pathology noted. It is clear that the pathology does not fit the complaints.

(*Id.* at 1586-87).

> Dr. Josephberg further concluded, as to Plaintiff's ability to work:

> Based upon my ophthalmologic findings, the claimant has full work capacity on a full-time consistent basis. He can work at any capacity from an ophthalmological standpoint … he constantly can do any activity over two-thirds of the work day.

(*Id.* at 1590). Dr. Josephberg similarly found "no restrictions and/or limitations based upon [his] ophthalmologic findings. (*Id.*). Dr. Josephberg noted, however, that his assessment did not address Plaintiff's cervical and/or lumbosacral spine complaints, and that additional testing could be conducted to identify the inconsistency between the objective tests and Plaintiff's subjective complaints. (*Id.* at 1590 (noting that electroretinogram ("ERG") testing "could be done to document the above statement and/or visual field testing"); *see also id.* ("I find no ophthalmologic reason where he cannot go back to a full-time job. Again, this does not address his lumbar problems or disc problems. I will agree that he might have lost some vision in his right eye, but totally disagree with his complaint that he cannot work based upon these findings.")).

In accordance with Plaintiff's request, RSLI provided Dr. Josephberg's February 21 Report to Plaintiff (and his reviewing physicians) for review and comment prior to RSLI making its final determination. (*See* AR 1604). RSLI also permitted Plaintiff to provide additional support for his application after

that review.  To that end, after reviewing the report, Dr. Charles arranged for Plaintiff to have an examination and ERG testing conducted by Dr. Stephen H. Tsang.  (*Id.* at 1612-13).  Dr. Tsang performed electroradiological studies, including a multifocal electroretinogram ("mgERG"), a pattern ERG ("PERG"), and MPI visual testing.  (*Id.* at 1639-57).  His two-page report, dated April 3, 2012, reported that the "[e]lectrophysiological findings are consistent with macular origin of visual loss"; this fact does not appear to have been in dispute, though the scope of the loss was hotly contested by the various medical professionals.  (*Id.* at 1613).  Dr. Tsang also summarized the results of his own examination of Plaintiff, in particular, relating that Plaintiff had "count finger" vision in his right eye.  (*Id.*).  Dr. Charles then submitted a letter to RSLI commenting on Dr. Tsang's report, in which he argued that Dr. Tsang's conclusions and the results of the ERG test contradicted Dr. Josephberg's conclusion.  (*Id.* at 1660).

Dr. Josephberg reviewed Dr. Tsang's additional testing, and produced an addendum to his report, dated May 9, 2012 (the "May 9 Addendum"). (AR 1686-91).  Dr. Josephberg's opinion was not altered by Dr. Tsang's test.  To the contrary, Dr. Josephberg found Dr. Tsang's report to confirm his belief that Plaintiff was exaggerating his subjective complaints.  Dr. Josephberg stated: "When Dr. Tsang tested [Plaintiff], he had [count fingers] vision, a dramatic improvement from my tests.  This shows that unfortunately William Wedge appears to have either a conversion syndrome or was malingering on the day I

13

saw him to magnify his loss of vision." (*Id.* at 1687).  Dr. Josephberg

explained:

> I still feel [Plaintiff] is capable of working and this ERG test proves
> he was not telling me the truth.  In conclusion, Mr. Wedge has a
> more than perfect PERG in his right eye and a normal P50 which
> indicate photoreceptor health.  With everything at hand Mr. Wedge
> most likely has at least 20/200 vision or better and this can be
> improved with PDT laser surgery.... His PERG P50 in his right eye
> was better than his left eye which suggests functional vision loss or
> malingering.

(*Id.* at 1689).  In closing, Dr. Josephberg stated that Plaintiff is qualified to do

"most jobs without a problem" and that his CSCR "does not warrant or cause

the significant disability that [Plaintiff] is claiming." (*Id.* at 1690).

### 3.  RSLI's Decision on Appeal

On August 6, 2012, RSLI issued a letter to Plaintiff denying his appeal.

(AR 294-99).  RSLI informed Plaintiff that after considering "the totality of

evidence in the claim file, [it] conclude[d] that the information does not

substantiate a physical condition that is at a level of severity that would

preclude Mr. Wedge from work function.  As such, he is not entitled to receive

any LTD benefits in connection with his claim." (*Id.* at 294).

To reach this decision, RSLI reviewed Plaintiff's "claim file in its entirety"

and considered the supplemental information that Plaintiff had provided to

RSLI.  (AR 294).  This included reviewing medical records from, among other

doctors, Dr. Charles and Dr. Tsang, which reports indicated that Plaintiff's

inability to work was a result of the CSCR in his right eye.  (*Id.* at 295-96).

RSLI then pointed to both of Dr. Josephberg's reports, and noted the doctor's

conclusions that Plaintiff "has full work capacity on a full-time consistent

basis" and "can work at any capacity from an ophthalmological standpoint." (*Id.* at 296).  RSLI also quoted at length from that portion of the May 9 Addendum in which Dr. Josephberg explained the bases for his opinion.  (*Id.* at 296-97).

RSLI further explained that it had reviewed Andrew Pasternak's vocational report and the REA conducted by RSLI's vocational department. These vocational assessments, viewed in connection with Dr. Josephberg's opinion, led RSLI to conclude that Plaintiff had a number of transferable skills based on his education and training that supported the determination that Plaintiff was suited for several alternative occupations, including Account Executive, Estimator, Media Planner, Public Relations Representative, and Advertising Sales Representative.  (AR 298).  RSLI indicated that its conclusion was "not only supported by the medical records of Mr. Wedge's own treating physician[,] but it is further substantiated by the independent opinion of Dr. Josephberg as well as the vocational evidence in the claim file."  (*Id.*).

Finally, RSLI acknowledged that Plaintiff had been found entitled to SSD benefits, but noted that receipt of such benefits did not equate to an entitlement to LTD benefits because "[a] person's entitlement to each of these benefits may be based upon a different set of guidelines, which sometimes may lead to differing conclusions."  (AR 298).  As relevant to Plaintiff's case, RSLI observed that the SSA did not consider Dr. Josephberg's opinion, which, if it had, may have resulted in it reaching a different determination.  (*Id.*).

**F.     The Instant Litigation**

On July 24, 2012, Plaintiff commenced this lawsuit against Defendants, claiming that RSLI had improperly terminated his disability benefits and found him ineligible for Any Occupation Benefits.  Plaintiff seeks damages for all unpaid disability benefits under the Policy from the time RSLI terminated his benefits on June 25, 2011, until the date a judgment is issued in this case. (Dkt. #1).

In contemplation of the parties filing dispositive motions, the Court raised the issue of the appropriate standard of review to apply to RSLI's denial of Plaintiff's benefits.  (Dkt. #18).  In that regard, the parties submitted a joint letter, and then, because the Court required further briefing, supplemental letter briefs on the issue of whether a *de novo* or an arbitrary and capricious standard would apply.  (*Id.*; Dkt. #25).  The parties agreed that, under the terms of the Shawmut Plan, claims decisions made by RSLI would ordinarily be subject to review under an arbitrary and capricious standard, in light of the Supreme Court's decision in *Firestone Tire and Rubber Co.* v. *Bruch*, 489 U.S. 101 (1989), because the Shawmut Plan vests discretion in RSLI.  (*See* Dkt. #26 at 1; Dkt. #27 at 1).

From this common ground, the parties' positions diverged markedly. Plaintiff contended that any deference to which RSLI's decision would otherwise be entitled was forfeited "because [RSLI] did not exercise its discretion in the time or manner required by ERISA."  (Dkt. #26 at 1).  Defendants, by contrast, argued that the Supreme Court has recognized no exceptions to the deferential

review standard established in *Firestone*, and that because the Shawmut Plan grants RSLI discretionary authority, RSLI's termination of Plaintiff's benefits must be reviewed under an arbitrary and capricious standard.  On September 10, 2013, the Court issued its Opinion, holding, in accordance with Supreme Court precedent, that RSLI's termination of Plaintiff's disability benefits would be reviewed under an arbitrary and capricious standard (the "September 10 Opinion").  *Wedge* v. *Shawmut Design and Const. Grp. Long Term Disability Ins. Plan*, No. 12 Civ. 5645 (KPF), 2013 WL 4860157, at *11 (S.D.N.Y. Sept. 10, 2013).

With the standard to be applied determined, the Court held a pretrial conference with the parties to discuss the briefing schedule for the parties' anticipated cross-motions for summary judgment.  Pursuant to the briefing schedule set at that conference, the parties filed their cross-motions for summary judgment on December 16, 2013 (Dkt. #32, 34); oppositions were filed on January 17, 2014 (Dkt. #38, 39); and the motions were fully submitted on January 24, 2014, when the parties' replies were filed (Dkt. #40, 42).

## DISCUSSION

**A.    Applicable Law**

### 1.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

(1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a

18

motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

### 2. The Standard of Review in ERISA Actions Involving Denial of Benefits

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co.* v. *Glenn*, 554 U.S. 105, 108 (2008); *see also* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought ... to recover benefits due to [the plaintiff] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."). Summary judgment is the typical procedural vehicle by which courts review a challenge to the denial of benefits under ERISA. *See Muller* v. *First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (recognizing that reviewing a denial of benefits under ERISA may be appropriately resolved by motions for summary judgment); *see also Gannon* v. *Aetna Life Ins. Co.*, No. 05 Civ. 2160 (JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007) ("The Second Circuit Court of Appeals has noted that a motion for judgment on the administrative record 'does not appear to be authorized in the Federal Rules of Civil Procedure' and that '[m]any courts have either explicitly or implicitly treated such motions....as motions for summary judgment under Rule 56.'" (quoting *Muller*, 341 F.3d at 124)). "Substantive ERISA law determines the proper standard of review that the Court should apply in reviewing the decision of the plan administrator, as well as whether the Court can consider materials beyond the administrative record." *Gannon*,

2007 WL 2844869, at *6.

"'ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations.'"  *Fay* v. *Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) (quoting *Zuckerbrod* v. *Phoenix Mut. Life. Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996)).  It is well established, however, that courts are to review challenges to a denial of benefits pursuant to ERISA under a *de novo* standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone*, 489 U.S. at 115; *see also Glenn*, 554 U.S. at 112 ("Where the plan … grant[s] the administrator or fiduciary *discretionary authority* to determine eligibility for benefits, [t]rust principles make a *deferential standard* of review appropriate." (internal citations omitted) (emphasis in original)).  Thus, where the administrator or fiduciary is granted discretionary authority, an arbitrary and capricious standard applies.  *Firestone*, 489 U.S. at 111; *see also Duncan* v. *Cigna Life Ins. Co. of New York*, 507 F. App'x 61, 62 (2d Cir. 2013) (summary order) ("Where a plan gives the administrator 'authority to determine eligibility for benefits or to construe the terms of the plan,' we review the administrator's interpretation of benefits for abuse of discretion."  (quoting *Firestone*, 489 U.S. at 115)).

As this Court determined in its September 10 Opinion, RSLI's termination of Plaintiff's LTD benefits must be reviewed under an arbitrary and capricious standard.  *Wedge*, 2013 WL 4860157, at *11.  This standard of review is "narrow," *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*,

20

419 U.S. 281, 285 (1974), and constitutes "the least demanding form of judicial review of administrative action," *Badawy* v. *First Reliance Standard Life Ins. Co.*, 581 F. Supp. 2d 594, 601 (S.D.N.Y. 2008). "Under this highly deferential standard of review, [a court] cannot substitute its judgment for that of the Plan Administrator and will not overturn a decision to deny or terminate benefits unless 'it was without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fuller* v. *J.P. Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir. 2005) (quoting *Pagan* v. *NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)); *accord Hobson* v. *Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009).

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic* v. *Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010) (internal quotation marks omitted). As applied to a motion for summary judgment, "the arbitrary and capricious standard requires that [the Court] ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *David* v. *Commercial Bank of New York*, 275 F. Supp. 2d 418, 425 (S.D.N.Y. 2003) (internal quotation marks omitted). In other words, RSLI's decision must be upheld "unless it is not grounded on *any* reasonable basis." *Id.* (emphasis in original).

In this setting, Wedge bears the burden of proving that he continues to

be eligible for disability benefits.  *See Critchlow* v. *First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004).

## B.    Analysis

As indicated, the parties have filed cross-motions for summary judgment. Plaintiff's motion requests that the Court reverse RSLI's termination of his long term disability claim and reinstate his benefits, as well as award him costs of this action and reasonable attorneys' fees, because RSLI's determination that Plaintiff was not entitled to LTD benefits was an abuse of discretion.  (Pl. Br. 1, 23).  Defendants request that summary judgment be entered in their favor dismissing Plaintiff's complaint and leaving RSLI's determination intact because the administrative record provides substantial evidence supporting RSLI's termination of Plaintiff's benefits.  (Def. Br. 1).  The parties' arguments in favor of, and in opposition to, their respective motions are duplicative and overlapping.  For that reason, the motions will be considered together.

### 1.    The Conflict of Interest Is Entitled to Minimal, If Any, Weight

In *Metropolitan Life Insurance Company* v. *Glenn*, 554 U.S. 105 (2008), the Supreme Court held that an ERISA-fund administrator that "both evaluates claims for benefits and pays benefits claims operates under a conflict of interest in making discretionary benefit determinations," and a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in determining whether there has been an abuse of discretion.  *Id.* at 110-15.  The import of the conflict of interest is contingent on the circumstances of the particular case.  *Id.* at 117.  The *Glenn* Court loosely

defined the parameters of the potential circumstances that may or may not give rise to a conflict of interest:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claim administration.   It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* (internal citation omitted).

Under *Glenn*, the court engages in a two-part assessment.  The initial inquiry simply asks "whether the plan administrator both evaluates claims for benefits and pays benefits claims." *Durakovic*, 609 F.3d at 138.  If the answer to this question is affirmative, the court next determines "how heavily to weigh[] the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, 'perhaps to the vanishing point.'" *Id.* (quoting *Glenn*, 554 U.S. at 117).  "The weight properly accorded a *Glenn* conflict varies in direct proportion to the likelihood that [the conflict] affected the benefits decision." *Id.* at 139 (internal quotation marks omitted).  More to the point, "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Id.* at 140.

Defendants admit that RSLI performs the dual role of insurer and decision maker, and that this "structural conflict" is a factor to be considered

23

under the arbitrary and capricious standard.  (Def. Br. 6).  The first *Glenn*
inquiry is answered in the affirmative, thus requiring the Court to consider the
weight to be afforded this conflict.  Defendants argue that no weight should be
given to this conflict because there is no evidence that the conflict impacted
RSLI's decision.  (*Id.*).  Plaintiff, on the other hand, argues that because RSLI
operated in a "result-oriented manner for its own financial interest," this Court
should afford its decision "a considerably reduced level of deference."  (Pl.
Br. 16).  Specifically, Plaintiff identifies three factors that support giving weight
to the conflict: RSLI's conduct in terminating Plaintiff's long term disability
benefits after suggesting that he pursue SSD benefits; the credit RSLI gave to
Dr. Josephberg's reports in the face of contrary opinions; and RSLI's non-
compliance with the deadlines governing its review of Plaintiff's claim.  (Pl.
Br. 14-15).

      As the Supreme Court recognized in *Glenn*, a conflict may be given more
weight where an administrator encouraged the claimant to pursue SSA
benefits, "receiv[ing] the bulk of the benefits of [the claimant's] success in doing
so (being entitled to receive an offset from her retroactive Social Security
award)," and then "ignor[ing] the agency's finding" when ultimately denying the
claimant benefits.  554 U.S. at 106.  And to be sure, RSLI did suggest that
Plaintiff pursue SSD benefits when, in April 2010, it initially granted Plaintiff
limited LTD benefits for his inability to perform the responsibilities of his "own
occupation."  (AR 257).  To that end, RSLI connected Plaintiff with counsel to

24

represent him in his efforts to obtain SSD benefits (*see id.* at 215), and was advantaged when Plaintiff was approved for SSD benefits.

Although the Court is cognizant that these circumstances raise the potential for providing weight to the conflict of interest, RSLI's conduct overall does not manifest the conflict of interest of which the *Glenn* Court was concerned.  RSLI did not ignore the SSA decision when denying Plaintiff LTD benefits.  Quite the opposite: RSLI's final denial letter directly addressed the differing determinations.  (*Id.* at 298).  RSLI informed Plaintiff that it had "consider[ed] the determinations of Social Security," and identified why the SSA determination was not binding on RSLI.  (*Id.*).  RSLI also explained to Plaintiff that the SSA did not have the benefit of, among other medical evidence, the reports of Dr. Josephberg that, in RSLI's estimation, might have caused the SSA to reach a contrary conclusion.  (*Id.*).

Plaintiff has provided no evidence that RSLI "has a history of biased claims administration," *Glenn*, 554 U.S. at 117, and the record does not suggest any particular bias at play here.  The record does indicate RSLI's efforts to reduce the "potential bias and to promote accuracy."  *Id.*  RSLI assigned multiple evaluators to assess Plaintiff's case at the initial and appeal stages, and had Dr. Josephberg complete an IME; it then allowed Plaintiff to comment on Dr. Josephberg's February 21 Report, and requested that Dr. Josephberg reconsider his findings in light of Plaintiff's supplemental comments and medical materials to ensure that his ultimate opinion reflected all of this information.  In addition, Plaintiff's appeal was reviewed by RSLI's

Quality Review Unit, and the review was conducted by different individuals than those who made the initial determination to deny Plaintiff's benefits.  (AR 294).  *See St. Onge* v. *Unum Life Ins. Co. of Am.*, — F. App'x —, 2014 WL 961055, at *3 (2d Cir. Mar. 13, 2014) (summary order) (holding that the district court properly gave little, if any, weight to the conflict of interest, where the administrator "employed numerous independent physicians and vocational evaluators, commissioned [a Functional Capacity Evaluation] conducted by an independent company, and consulted with [the claimant] and her treating physician"); *Siegel* v. *Hartford Life Ins. Co.*, No. 10 Civ. 4285 (DRH) (ETB), 2012 WL 2394879, at *16 (E.D.N.Y. June 25, 2012) (discussing actions taken to avoid a conflict of interest, including "assign[ment] of multiple individuals to make and then review the initial decision to deny [the plaintiff's] claim, and assign[ment of] separate individuals to process [the plaintiff's] appeal, all of which promotes accuracy of the administrator's review process" (citation omitted)); *Burgio* v. *Prudential Ins. Co. of Am.*, No. 06 Civ. 6793 (JS) (AKT), 2011 WL 4532482, at *8 (E.D.N.Y. Sept. 26, 2011) (finding that the administrator took "measures to reduce the risk of bias caused by its conflict of interest," where "Plaintiff's claims and appeals were decided by different [administrator] employees, and these employees' compensation was not tied in any way to their eligibility determinations").  The process followed by RSLI evinces its concern with ensuring that its determination was thoroughly vetted by the appropriate medical and vocational personnel and accurately represented the available medical and vocational information.

26

The other grounds on which Plaintiff predicates his conflict of interest claim also ring hollow.  "[P]rocedural unreasonableness," *Glenn*, 554 U.S. at 118, such as RSLI's noncompliance with the deadlines, may be a factor in determining the import of a conflict of interest.  Here, however, there is no evidence that RSLI's noncompliance impacted its final decision.  Indeed, it only benefitted Plaintiff, inasmuch as the extended time during which his claim was processed afforded Plaintiff an opportunity to review and comment on Dr. Josephberg's February 21 Report, to be examined by an additional doctor, Dr. Tsang, and to submit additional evidence in support of his application.  As for RSLI's decision to credit Dr. Josephberg's reports, its actions, as discussed more *infra*, were entirely appropriate.  Because there is no evidence that the conflict affected RSLI's determination to deny Plaintiff LTD benefits, this factor warrants minimal, if any, weight, in the Court's assessment of whether RSLI's decision was arbitrary and capricious.

### 2.    The Court Will Limit Its Review to the Administrative Record

Next, the Court must consider the scope of the record on review.  Plaintiff relies on evidence outside the administrative record in support of his motion, namely excerpts from the deposition of Dr. Josephberg conducted on April 5, 2013, and a prepared statement by Plaintiff dated February 7, 2012, that Plaintiff provided to Dr. Josephberg at the time of his IME, but which was not included in the administrative record ("Plaintiff's February 7 Statement").  Defendants contend that consideration of these materials is improper.  (Def. Opp. 7).

In ERISA cases applying an arbitrary and capricious review, the Second Circuit has "repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary," and that this "discretion ought not to be exercised in the absence of good cause." *Krauss* v. *Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008); *see also Biomed Pharm., Inc.* v. *Oxford Health Plans (N.Y.), Inc.*, 831 F. Supp. 2d 651, 658 (S.D.N.Y. 2011) ("While it is true that a court's review of an ERISA claim under an arbitrary and capricious standard is generally limited to evidence in the administrative record, the court has discretion to admit evidence outside the record upon a showing of good cause." (internal quotation marks omitted)). "Although a Defendant's demonstrated conflict of interest may be an example of good cause, a conflicted administrator does not *per se* constitute good cause, and … a finding of a conflicted administrator alone should not be translated *necessarily* into a finding of good cause." *Demonchaux* v. *Unitedhealthcare Oxford*, No. 10 Civ. 4491 (DAB), 2012 WL 6700017, at *11 (S.D.N.Y. Dec. 20, 2012) (internal citations and quotation marks omitted) (emphasis in original). Such "a *per se* rule would effectively eliminate the 'good cause' requirement and the discretion afforded to district courts in deciding whether to admit additional evidence." *Locher* v. *Unum Life Ins. Co. of Am.*, 389 F.3d 288, 295 (2d Cir. 2004).

The Court finds no good cause to expand the scope of the record beyond that contained in the administrative record.  To the contrary, Dr. Josephberg's deposition excerpts and Plaintiff's statements do not contain any information

that is not already generally reflected in the administrative record, and thus inclusion of this evidence would not impact the Court's ultimate decision. Conversely, exclusion of this evidence will not prejudice Plaintiff. Moreover, even if there were good cause, Plaintiff relies on excerpts from Dr. Josephberg's deposition to challenge the merits of RSLI's determination. "Although extra-record evidence might sometimes be admissible to assist procedural inquiries," introduction of such evidence "to challenge [an administrator's] substantive determination" is not appropriate. *Richard* v. *Fleet Fin. Grp. Inc. Ltd. Employee Benefits*, 367 F. App'x 230, 233 (2d Cir. 2010) (summary order) (citing *Zervos* v. *Verizon N.Y., Inc.*, 277 F.3d 635, 646-47 (2d Cir. 2002)).

There being no good cause to admit evidence outside the administrative record, the Court's decision will be based on that record alone.

### 3. RSLI's Determinations That Plaintiff Was Not Entitled to Long Term Disability Benefits Were Not Arbitrary and Capricious

#### a. The Court Will Consider Both of the Challenged RSLI Decisions

Plaintiff charges that both RSLI's initial determination in June 2011 that he was not entitled to LTD benefits and its final decision on appeal in August 2012 confirming its initial finding were arbitrary and capricious. (Pl. Br. 17-21). Defendants contend that this Court should not separately examine the original claim decision and final decision on appeal, as Plaintiff's argument implicitly requires. (Def. Opp. 3). In particular, Defendants rely on two cases, *Zarringhalam* v. *United Food & Commercial Workers Int'l Union Local 1500 Welfare Fund*, No. 11 Civ. 2913 (JFB) (WDW), 2012 WL 5989896, at *12

(E.D.N.Y. Nov. 30, 2012), and *Muller* v. *First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003), that, in broad terms, acknowledge that courts will review the administrative record in its entirety when determining whether an administrator's decision was arbitrary or capricious.  (*Id.*).  The Court does not dispute the validity of these opinions.  These decisions, however, do not foreclose the Court from considering whether RSLI's initial or final decision was arbitrary or capricious, and the Court has found no reason why it should not do so.  *See, e.g.*, *Miles* v. *Principal Life Ins. Co.*, 720 F.3d 472, 487 (2d Cir. 2013) (considering the administrator's initial and final decision).

In denying Plaintiff's claim for LTD benefits, RSLI did not, and does not now, dispute that Plaintiff has CSCR in his right eye.  RSLI's determination was simply that Plaintiff did not satisfy his burden under the Plan to establish that he was Totally Disabled, as defined under the Policy, and, further, that because Plaintiff did not prove that he was, he was not entitled to the benefits he sought.  As made clear herein, RSLI determinations to terminate Plaintiff's benefits were reasonable, supported by substantial evidence, and not erroneous as a matter of law.  Accordingly, RSLI decision was not arbitrary and capricious, and should not be disturbed.

### b.   RSLI's Initial Denial of Plaintiff's Extended LTD Benefits

As detailed above, RSLI's initial decision to deny Plaintiff LTD benefits was based on its conclusion that Plaintiff had not demonstrated his inability to perform the materials duties of "any occupation."  (AR 277).  "Any occupation is one that [Plaintiff's] education, training[,] or experience will reasonably allow."

(*Id.*).  In making this assessment, RSLI relied on Plaintiff's entire claim file, which included, among other information, medical records from Dr. Charles. These records documented that Plaintiff had been diagnosed with CSCR in his right eye (AR 654); was legally blind in that eye (*id.* at 278); and had a corrected vision of 20/30 in his left eye (*id.*).  Yet the opinions contained in those records were not perfectly consistent.  Dr. Charles informed RSLI in December 2010 that, given Plaintiff's "line of work," there were "no possible accommodations" that would enable him to perform the functions of his own occupation.  (*Id.* at 689).  However, Dr. Charles noted just a few months earlier, in his May 26, 2010 report, that Plaintiff's "level of vision is not consistent with the macular findings," and suggested to Plaintiff that updated testing might be warranted. (*Id.* at 692).  Such testing does not appear to have been done at the time of the initial denial.

RSLI also arranged for an REA to be conducted to determine which occupations, if any, Plaintiff retained the ability to perform.  (AR 741).  The Vocational Rehabilitation Specialist ("VRS") who performed the assessment for RSLI had abundant expertise, including possessing a master's degree and receiving a "Certified Rehabilitation Counselor designation by satisfying the advanced education and experience requirements of the nationally accredited Commission on Rehabilitation Counselor Certification."  (*Id.*).  The REA concluded that Plaintiff had transferable skills that, despite his limitations from CSCR, enabled him to be employed in one of the following occupations: Account Executive, Estimator, Media Planner, Public Relations Representative,

and Advertising Sales Representative.  (*Id.* at 743).  The REA explicitly
indicated that the VRS, in reaching her conclusion that Plaintiff was suited for
these positions, had considered Plaintiff's "ongoing visual impairment, lack of
depth perception, [and] inability to work around moving machinery, at heights
and[/]or on uneven ground."  (*Id.* at 742).

Plaintiff proffers five challenges to RSLI's initial decision, some of which
are reiterated with respect to RSLI's final decision, and claims that each
renders the decision arbitrary and capricious.  First, Plaintiff argues that it was
improper for RSLI's decision to be predicated on a review by its qualified
registered nurse because RSLI was required to have Plaintiff's file reviewed by a
qualified expert.  (Pl. Br. 17).  In support of this claim, Plaintiff points to 29
C.F.R. § 2560.503-1(h)(3)(iii) and (h)(4).  As Defendants aptly identify, these
regulations pertain to the "appeal of adverse benefit determinations," and not
the initial decision.  29 C.F.R. § 2560.503-1(h).

Even assuming the applicability of this section to RSLI's initial decision,
Plaintiff would still have not established that a review by a qualified registered
nurse was insufficient.  Section 2560.503-1(h)(3)(iii) provides, in relevant part:

> The claims procedures of a group health plan will not be deemed to
> provide a claimant with a reasonable opportunity for a full and fair
> review of a claim and adverse benefit determination unless … the
> claims procedures — [p]rovide that, in deciding an appeal of any
> adverse benefit determination that is based in whole or in part on a
> medical judgment, including determinations with regard to
> whether a particular treatment, drug, or other item is
> experimental, investigational, or not medically necessary or
> appropriate, the appropriate named fiduciary shall consult with a
> health care professional who has appropriate training and
> experience in the field of medicine involved in the medical
> judgment.

29 C.F.R. § 2560.503-1(h)(3)(iii).  The record demonstrates that "a health care professional who has appropriate training and experience" reviewed Plaintiff's initial claim.  Specifically, the reviewing nurse had "the training and experience in the areas of nursing practice encompassed in [Plaintiff's] review."  (AR 136).

Plaintiff's second argument, that the nurse claim analyst did not recognize Plaintiff's self-reported limitations as to his ability to read or use the computer for an extended time without experiencing severe headaches, is refuted by the record.  The record notes that Plaintiff has "trouble writing, reading, [and] looking at [a] computer."  (AR 138).  In any event, RSLI's denial letter makes clear that it "reviewed all of the information in [Plaintiff's] claim file," which Plaintiff concedes includes documentation of his subjective complaints regarding secondary impairments (i.e., severe headaches, back and neck pain) caused by his CSCR.  (Pl. Br. 17).  The record does not demonstrate that RSLI "overlooked" this aspect of Plaintiff's claim, as he contends, but only that it afforded it less weight in considering the totality of the information before it.

Plaintiff's remaining arguments concern the REA: he contends that (i) because the letter terminating his benefits was issued one day after the REA was completed, the decision to deny Plaintiff's claim was a "foregone conclusion"; (ii) the REA was flawed because it was based "solely on the nurse-reported depth-perception limitations"; and (iii) it was improper for the REA to rely on the U.S. Department of Labor's Dictionary of Occupational Titles, Fourth Edition, Revised 1991 ("DOT") because it used outdated data and

suggested occupations that required near visual acuity as a core ability.  None of these arguments establishes that RSLI's decision was arbitrary and capricious.

The Court can summarily reject the first two of Plaintiff's challenges to the REA.  For starters, RSLI's receipt of the REA one day prior to it issuing its letter does not, in general or on this specific record, denote any impropriety.  Moreover, the Court's previous conclusion that the use of a registered nurse for the REA was appropriate dooms Plaintiff's second argument.  Finally, and contrary to Plaintiff's assertion, RSLI's use of the DOT was "not arbitrary and capricious in and of itself."  *Sewell* v. *Lincoln Life & Annuity Co. of New York*, No. 11 Civ. 4236 (ALC), 2013 WL 1187431, at *12 (S.D.N.Y. Mar. 22, 2013).  "Although the DOT was last updated in 1991, it is commonly used to evaluate generalized occupations in private disability disputes."  *Thomas* v. *The Hartford Life Ins. Co. of Am.*, No. 11 Civ. 1490 (LLS), 2013 WL 53710, at *2 (S.D.N.Y. Jan. 2, 2013).  Plaintiff's own vocational expert, Andrew Pasternak, admitted as much in his report when he wrote that "[j]obs in the United States are classified in the [DOT], a standard vocational reference."  (AR 803).

Similarly, the fact that REA identified occupations that listed "near acuity" as one of the physical demands does not in and of itself establish that RSLI's initial decision was an abuse of discretion.  Plaintiff's medical records indicated that Plaintiff had 20/30 vision in his left eye when corrected and Dr. Charles's May 2010 report concluded that Plaintiff's "level of vision is not consistent with the macular findings."  (AR 692; *see also id.* at 1540

(observation of Dr. Bernstein of inconsistency between Plaintiff's subjective complaints and objective tests)).  Based on this, and the rest of the record, it was reasonable for RSLI to conclude that Plaintiff could perform occupations that required some degree of near acuity.

For all of these reasons, RSLI's initial determination to deny Plaintiff LTD benefits was not arbitrary and capricious.

### c.   RSLI's Final Denial of Benefits on Appeal

RSLI's denial of Plaintiff's appeal of the termination of his LTD benefits was supported, in addition to all the materials relied upon when making its initial determination, by Dr. Josephberg's reports and the supplemental information provided by Plaintiff, such as reports from Dr. Tsang, Dr. Charles, and vocational evidence from Mr. Pasternak.  Indeed, as RSLI noted in its denial letter, its decision was supported not only by Dr. Josephberg's assessments, but by opinions from Plaintiff's own treatment providers.  Based on Plaintiff's "claim file in its entirety," RSLI concluded that "the information does not substantiate a physical condition that is at a level of severity that would preclude Mr. Wedge from work function."  (AR 294).  Instead, RSLI concluded that, based on Plaintiff's restrictions and limitations, he was capable of being employed as an Account Executive, Estimator, Media Planner, Public Relations Representative, and Advertising Sales Representative.

Dr. Josephberg's February 21 Report is a highly detailed, eleven-page assessment of Plaintiff that was completed after an in-person examination. (AR 1581-91).  Based on his examination and a review of Plaintiff's entire claim

file, Dr. Josephberg concluded that Plaintiff had "full work capacity on a full time consistent basis" and that he "can work at any capacity from an ophthalmological standpoint." (*Id.* at 1590). He directly considered Plaintiff's subjective complaints, but found those complaints not credible in light of the objective tests that he, and Plaintiff's medical providers, conducted. (*Id.*). Specifically, Dr. Josephberg stated:

> All of my findings today are inconsistent with [Plaintiff's] complaints and in fact his vision appears to be significantly much better, based upon the objective findings. Pupillary testing along with my examination indicates much better vision than he is claiming, along with confrontation of visual fields.... I will agree that [Plaintiff] might have lost some vision in his right eye, but totally disagree with his complaint that he cannot work based on these findings.

(*Id.*). Dr. Josephberg then reaffirmed his conclusion after being presented with additional information from Dr. Tsang, finding that Dr. Tsang's examination further supported his belief that Plaintiff was malingering. (*Id.* at 1687). Dr. Josephberg reiterated that Plaintiff was "qualified to do most jobs without a problem," and that Plaintiff's "condition does not warrant or cause the significant disability that Mr. Wedge is claiming." (*Id.* at 1690).

Dr. Josephberg's reports provided a cohesive assessment of Plaintiff's condition; they accounted for the copious medical records in Plaintiff's file; and, contrary to Plaintiff's arguments, they were true to the records. Moreover, Dr. Josephberg did not summarily dismiss Plaintiff's subjective complaints. Rather, based on a review of all Plaintiff's records — from Dr. Charles's 2010 report to Dr. Tsang's examination — he concluded that Plaintiff was not experiencing the severe disability that he alleged. The doctor's reports display

his search for medical data to support Plaintiff's complaints.  Such data, however, was insufficiently present in the record.  Accordingly, there was substantial evidence supporting RSLI's termination of Plaintiff's LTD benefits, and this decision was not arbitrary and capricious.  *See Durakovic*, 609 F.3d at 141 (holding that a funds' determination was not arbitrary and capricious where the funds' determination was supported by the reports of two independent doctors, even in light of contrary findings by five treating physicians and the Social Security Administration); *see also Fortune* v. *Grp. Long Term Disability Plan for Employees of Keyspan Corp.*, 637 F. Supp. 2d 132, 142 (E.D.N.Y. 2009) ("It suffices that there was plausible medical evidence in the record that a reasonable mind could accept as adequate to support the conclusion reached by [the administrator].").

Plaintiff bases his argument that RSLI's final denial of his benefits was arbitrary and capricious on four grounds: (i) RSLI improperly ignored the Pasternak vocational report and related data; (ii) RSLI unreasonably relied on Dr. Josephberg's reports; (iii) RSLI failed to pursue Dr. Josephberg's investigative recommendations; and (iv) RSLI improperly discounted the SSA determination awarding Plaintiff benefits.  (Pl. Br. 19-22).  Plaintiff also argues, in opposition to Defendants' motion for summary judgment (and based largely on snippets quoted from Defendants' moving papers), that RSLI misapplied the Policy's "any occupation" disability standard by interpreting it as meaning that Plaintiff is not disabled under the Policy "if he retains any residual work capacity."  (Pl. Opp. 21).

To start, the Court rejects Plaintiff's last argument.  Neither the record nor RSLI's arguments before the Court suggest that it misapplied the applicable standard.  Rather, the record supports the conclusion that RSLI appropriately applied the "any occupation" standard, including identifying alternative occupations for Plaintiff based on his education, training, and experience.

Taking the remaining arguments in turn, the Court will begin with the first two, as they both target the propriety of RSLI's evidentiary review.  Put simply, the record refutes Plaintiff's arguments.  RSLI's denial letter states that it considered Mr. Pasternak's report and opinion, but that given Dr. Josephberg's opinions, it adhered to its initial decision that Plaintiff was capable of performing the identified occupations.  (AR 297).  "As the Supreme Court has explained, 'courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Hobson*, 574 F.3d at 85 (quoting *Black & Decker Disability Plan* v. *Nord*, 538 U.S. 822, 834 (2003)).  This is equally true with respect to opinions rendered by vocational experts.  *Powers* v. *Nat'l Rural Letter Carriers' Ass'n Long-Term Disability Income Plan*, No. 4:07 Civ. 62 (DFH) (WGH), 2009 WL 1259378, at *7 (S.D. Ind. May 5, 2009) (quoting the Supreme Court's rule that courts need not accord special weight to the opinions of a claimant's physician nor provide an explanation when they credit reliable conflicting

evidence and stating that "[t]his rationale applies equally to the independent findings of the plaintiff's own vocational expert").

The record does not indicate that RSLI ignored Mr. Pasternak's opinions, or any of the other evidence submitted by Plaintiff.  Rather, objective evidence, including Dr. Josephberg's reports and, to a lesser extent, Dr. Charles's May 2010 report and Dr. Bernstein's report, supported RSLI's determination that Plaintiff was not disabled to the extent claimed.  The Court does not dispute that later medical records, such as Dr. Charles's subsequent reports, augmented, and arguably clarified, his May 2010 report and Dr. Bernstein's report, both of which make mention of a disparity between Plaintiff's pathology and symptomatology.  That conclusion, however, does not alter the Court's analysis, nor does it impose a requirement on RSLI to find in Plaintiff's favor. As just stated, RSLI was not required to "accord special weight to the opinions" of Plaintiff's physicians.  *Hobson*, 574 F.3d at 85.  The physician it retained to perform the IME, Dr. Josephberg, reviewed the same data and came to a different — but medically justifiable — conclusion.

Moreover, that RSLI's decision was not solely (and improperly, as Plaintiff contends) predicated on Dr. Josephberg's opinion is evident by its ultimate decision that Plaintiff was capable of performing a subset of the professions identified in the REA, as opposed to the totality of positions listed there, or as opposed to Dr. Josephberg's conclusion that he was "qualified to do most jobs without a problem."  (AR 1690).  *See Rozek* v. *New York Blood Center*, 925 F. Supp. 2d 315, 338 (E.D.N.Y. 2013) (rejecting challenge to plan's decision to

accord less weight to vocational expert Pasternak, where that assessment was "contrary to the functional capacity findings made in the course of the Defendants' medical review of the Plaintiff's claim and with the findings of the [Functional Capacity Evaluation]"), *appeal withdrawn*, No. 13-1083 (May 29, 2013).

In the same vein, RSLI did not ignore Plaintiff's subjective complaints, as Plaintiff contends. (Pl. Br. 17). The Second Circuit "has long recognized that subjective complaints of disabling conditions are not merely evidence of a disability, but are an 'important factor to be considered in determining disability.'" *Miles*, 720 F.3d at 486 (quoting *Connors* v. *Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001)). For this reason, "a reviewing court is obliged to determine whether a plan administrator has given sufficient attention to [the claimant's] subjective complaints ... before determining that they were not supported by objective evidence." *Id.* (internal quotation marks omitted). The record reflects that sufficient attention was given to Plaintiff's complaints. Dr. Josephberg's medical assessments, which RSLI quoted at length and incorporated in its denial letter, directly addressed, but rejected, Plaintiff's subjective complaints. Dr. Josephberg wrote: "I find my objective findings to be totally inconsistent with the subjective complaints by [Plaintiff]." (AR 1587).

RSLI was expressly permitted to rely on the objective evidence that it did "to guard against fraudulent or unsupported claims of disability," as was the case here. *Hobson*, 574 F.3d at 88 ("We conclude that it is not unreasonable

for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability."); *Fortune*, 637 F. Supp. 2d at 143 (holding that the administrator "did not abuse its discretion by failing to credit [the plaintiff's] subjective and unsubstantiated complaints of disabling fatigue," where two physicians noted that the plaintiff's subjective complaints and found them inconsistent with the objective medical evidence).  It was Plaintiff's burden to proffer objective medical evidence to substantiate his subjective complaints — a burden Plaintiff failed to meet.  *Id.* ("Several courts in the Eastern and Southern District of New York have found that it is not arbitrary for an administrator to require a claimant to offer objective medical evidence of their disabilities in order to be eligible for benefits.").

In sum, Plaintiff's claim that he provided substantial evidence that he was entitled to LTD benefits is not borne out by the record.  As indicated previously, Plaintiff's own medical providers questioned the veracity of his proffered limitations.  And Dr. Charles's mere incantation of Plaintiff's subjective complaints, such as his perceived visual limitations and severe headaches, do not convert those subjective complaints into objective data of Plaintiff's limitations.[6]  In any event, RSLI was "not required to accord the opinions of a claimant's treating physician's 'special weight,' especially in light of contrary independent physicians' reports." *Hobson*, 574 F.3d at 90 (quoting

---

[6]    By contrast, Dr. Tsang's report, which provided objective information and test results concerning Plaintiff's ophthalmological issues, did not address his subjective complaints.  (AR 1612-13).

*Black & Decker*, 538 U.S. at 834).  RSLI's decision to credit Dr. Josephberg's reports was thus reasonable.  *Hobson*, 574 F.3d at 85 (holding that the administrator "acted within its discretion in relying upon the conclusions of its independent consultants' three reports [] [b]ecause the three reports provided detailed, substantive analysis" of the plaintiff's disability).

Plaintiff's remaining two arguments lack merit.  As noted, it was Plaintiff's burden generally, and specifically here under the Policy, to prove that he was eligible for continued disability benefits.  (AR 14, 277).  *See generally Critchlow*, 378 F.3d at 256 ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered…."); *Ingravallo* v. *Hartford Life and Acc. Ins. Co.*, — F. App'x —, 2014 WL 1622798, at *2 (2d Cir. Apr. 24, 2014) (summary order) ("[The insured] bears the burden of proving the she continues to be eligible for disability benefits." (citing *Hobson*)).  With the burden placed squarely on Plaintiff, RSLI was under no obligation to pursue the additional medical evaluations identified by Dr. Josephberg.  *Wojciechowski* v. *Metro. Life Ins. Co.*, 1 F. App'x 77, 81 (2d Cir. 2001) (summary order) (holding that it was the claimant's burden under the insurance plan to submit objective testing); *see also Young* v. *Hartford Life and Acc. Ins. Co.*, No. 09 Civ. 9811 (RJH), 2011 WL 4430859, at *11 (S.D.N.Y. Sept. 23, 2011) ("The Second Circuit has never found that ERISA fiduciaries have a duty to gather information.").

Finally, the fact that RSLI's determination differed from the SSA decision is of no moment. "While SSA awards may be considered when determining whether a claimant is disabled, a plan administrator is not bound

by the award and is not required to accord that determination any 'special deference.'" *Testa* v. *Hartford Life Ins. Co.*, 483 F. App'x 595, 598 (2d Cir. 2012) (summary order) (quoting *Durakovic*, 609 F.3d at 141); *Rudolph* v. *Joint Indus. Bd. Of Elec. Indus.*, 137 F. Supp. 2d 291, 300 (S.D.N.Y. 2001) ("A plan administrator making discretionary determinations as to eligibility is not bound by the determination of the Social Security Administration.").

The record does not reflect that RSLI improperly discounted the SSD award. The final denial letter to Plaintiff made clear that RSLI understood that it was not bound by the SSA decision, and that it questioned whether the SSA would have arrived at the same conclusion had it considered Dr. Josephberg's opinion. The Second Circuit "encourage[s] plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion," but it does not require that an administrator do so. *Hobson*, 574 F.3d at 92 (holding that the administrator's failure to explain why its decision differed from the SSA's determination did not render its decision denying the insured benefits arbitrary and capricious); *Richard*, 367 F. App'x at 233 (identifying that there was "no merit to [the insured's] contention that the [administrator] was required to explain why its decision differed from that of the Social Security Administration"). As it happened, RSLI did explain its reasons for reaching the opposite conclusion as the SSA in light of the substantial evidence supporting the denial of Plaintiff's LTD benefits. (AR 298).

Based on this record, and considering the appropriate weight that must be afforded to the *Glenn* conflict, any rational trier of fact would conclude that RSLI's decision had adequate support, and was based on far more than "a scintilla" of evidence.  Accordingly, Plaintiff's motion for summary judgment is denied, and Defendants' motion for summary judgment is granted.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate Docket Entries 32 and 34, and mark this case as closed.

SO ORDERED.

Dated:     June 2, 2014
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge